THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

May 13, 2022

*Via* **ECF**

The Honorable Jed S. Rakoff
U.S. District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Fred Asante,* 21 Cr. 88 (JSR)

Dear Judge Rakoff,

This Court should sentence Mr. Asante to 36 months' imprisonment.  Thirty-six months' imprisonment is appropriate because: (1) his history and characteristics establish that he has taken full responsibility for his actions, is deeply remorseful for his conduct, and enjoys the full support of not only his closest family and friends, but also his community; (2) he has been subjected to harsh pre-trial detention conditions; and (3) his advisory United States Sentencing Guidelines ("U.S.S.G.") range, overwhelmingly driven by the loss amount, does not represent an appropriate sentence.

Mr. Asante has worked to better himself and to be a father from which his children can learn.  He started his own business that was successful and provided for his immediate family and his mother.  This business started out as a wholly legitimate venture and would have stayed that way had Mr. Asante not been lured by the opportunity to convert his sale proceeds on the black market and save money.  While Mr. Asante was not involved in defrauding victims, he was aware that the money was illicit.  His willful blindness made taking the money a little bit easier on his conscience.  Mr. Asante has shown his family, friends, and this Court that he has accepted full responsibility.  For the majority of the time this case has been pending, Mr. Asante has been imprisoned in unduly harsh conditions.  He has been incarcerated at Essex County Correctional Facility under nearly constant lockdown without basic human necessities like showers, or even time outside to breathe fresh air.

Finally, the loss attributable to him pursuant to U.S.S.G. §2B1.1 accounts for more than half of his 30 offense points. This large increase attributable to loss renders the Guidelines calculation an unreliable indicator as to the appropriate sentence. Mr. Asante has been incarcerated since his arrest in harsh conditions, and a lengthy sentence is not required to deter him from further crimes. Accordingly, we respectfully submit that after the Court takes into account the conditions of his confinement and 18 U.S.C. § 3553(a)'s sentencing factors, it will agree that 36 months' imprisonment is sufficient but not greater than necessary.

## I.    The United States Advisory Sentencing Guidelines Range and Pre-Sentence Report

Mr. Asante pled guilty, pursuant to a plea agreement, in which he and the government agreed on the application of the advisory Guidelines. The Probation Office's calculation in the Pre-Sentence Report ("PSR") accurately mirrors that contained in the plea agreement. Accordingly, Mr. Asante agrees that he faces an advisory Guidelines range of 121-151 months' imprisonment.

The Probation Office recommends that the Court sentence Mr. Asante to 121 months. However, the Probation Office does not consider, or even mention, the conditions under which Mr. Asante has had to serve his pretrial detention. As noted below, courts in this District and throughout the country have almost universally recognized the harshness of pretrial detention conditions due to COVID-19 and the precautions and lockdowns imposed by correctional institutions across the country. The Probation Office should have factored the COVID-19 detention conditions in fashioning the appropriate sentencing recommendation. Probation was equally remiss in making its sentencing recommendation without factoring in the positive work that Mr. Asante has done in his community, and the loss that his community faces with him incarcerated. The entire foundation for the Probation Office's recommendation is his previous conviction, using that as justification for their conclusion that Mr. Asante has not been deterred. They do not recognize the age of the conviction, more than 16 years ago, steps that he has taken towards rehabilitation, or the qualitative differences in the offenses.[1]

## II.    A Just Sentence Must Recognize the Heightened Hardships Mr. Asante Suffered Being Incarcerated During the COVID-19 Pandemic

Mr. Asante has been imprisoned during the harshest time in recent history to be incarcerated, and he has done so without a single infraction. Since his arrest and detention in February 2021, Mr. Asante has been subjected to various forms of lockdown and restrictions due to the pandemic. At points of his detention the lockdowns partially lifted, only to be revived due to additional COVID-19 outbreaks

---

[1] The PSR was completed without acknowledging the defense's objections, which were provided to the Probation Office on April 26, 2022. *See* Email of Defense's Objections Annexed Hereto as Exhibit "A". Paragraph 68 of the PSR includes contradicting sentences regarding Mr. Asante's substance use. At no point in the Probation Office's interview with Mr. Asante did he say that he has a problem with marijuana, nor did Mr. Asante claim that he is open to drug treatment, and the topic of drug treatment was never discussed. His conduct back in 2006 was the last time that he was involved with narcotics in any way – personal use or otherwise. Additionally, the report was filed on May 10, 2022. The Probation Office had not spoken to Mr. Asante's wife to verify any of the information provided until May 9, 2022. Subsequently, in the final PSR Fred's children's ages were inaccurate and, and the report says that he has fathered three children when he has in fact fathered four. *See* PSR at 24. This added text was not in the draft provided to the defense, and we ask that the Court take note of defense's objections.

possibly related to new COVID-19 variants.  Mr. Asante is bracing for another potential round of lockdowns related to the new variants being reported in Europe and Asia, and the increasing number of cases reported in the United States.  Serving time during COVID-19 has been extremely harsh and will likely continue to be in these uncertain times.

Substandard pre-sentence housing conditions is certainly relevant to a defendant's sentencing.  For example, pre-pandemic, judges in this Circuit have considered the substandard conditions in the 11-South Unit of MCC and adjusted sentences accordingly.  *See United States v. Behr*, No. S1 03 Cr. 1115 (RWS), 2006 WL 1586563 *5 (S.D.N.Y. Jun. 9, 2006) (imposing time-served sentence where defendant housed in MCC's 11-South Housing Unit).  Harsh pre-sentencing conditions constitute collateral punishment that warrants a sentencing variance because "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Francis*, 129 F. Supp. 2d 612, 616-19 (S.D.N.Y. 2001) (downwardly departing because defendant spent more than thirteen months in substandard conditions including, overcrowding and inadequate hygiene). More specifically and particularly relevant are the courts in this District and the Eastern District of New York that have varied downward as a result of the onerous pre-sentence detention conditions during COVID-19.  *See, e.g., United States v. Martinez*, 18 Cr. 669 (JPO) (S.D.N.Y.) (time spent in MCC during COVID equivalent to 1.5 to 2 times the normal time); *United States v. Browning*, 20 Cr. 2 (VSB) (S.D.N.Y.) (not the fault of the BOP but concluding that there was no question that the time was more difficult); *United States v. Diaz*, 20 Cr. 305 (DLC) (S.D.N.Y.) (downward variance based on MDC COVID conditions); *United States v. Paulino*, 19 Cr. 607 (AJN) (S.D.N.Y.) (downwardly varying based on COVID prison conditions); *United States v. Rodriguez*, 19 Cr. 817 (LAK) (S.D.N.Y.) (same); *United States v. Amado-Ortiz*, 19 Cr. 923 (JMF) (S.D.N.Y.) (same); *United States v. Edwards*, 20 Cr. 618 (VLB) (S.D.N.Y.) (custody during COVID "unusually harsh"); *United States v. Latney*, 18 Cr. 606 (JS)(E.D.N.Y.) (same); *United States v. Carpenter*, 18 Cr. 362 (GRB) (E.D.N.Y.) ("I am going to find that the Guidelines have not and at this point in history cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration."); *United States v. Battle*, 20 Cr. 349 (EK) (E.D.N.Y.) (harsh conditions tantamount to unearned disciplinary segregation or worse).

This Court too has recognized that conditions in pre-trial incarceration are more severe than they were before the pandemic began, and should be treated as such.  *See United States v. Cirino*, 19 Cr. 323 (recognizing the abnormally harsh conditions of incarceration during the pandemic as a mitigating factor).  This Court has taken these conditions into account when determining a defendant's appropriate sentence.  *See United States v. Marmolejo,* 20 Cr. 1, ECF No. 35 at 14:14-17 (noting, in sentencing a defendant with a Guidelines' range of 87 to 108 months' imprisonment to 18 months' imprisonment, that "he's been punished more tha[n] the time period would otherwise suggest, and he ought to be given in effect credit because he's endured those harsher conditions."); *United States v. Horge*, 19 Cr. 96, ECF No. 253 at 12:4-8 (noting that defendant with a Guidelines' range of 135 to 168 months' imprisonment but capped at 96 months' imprisonment "needs to be credited, not only for the actual months he's already served in prison, … but also for the fact that that was during the pandemic and was, therefore, harsher than would normally be the case.").

Mr. Asante has been detained since February 2021 under extremely harsh conditions and the unprecedented lockdowns and restrictive conditions of correctional facilities in connection with the COVID-19 pandemic.  Inmates have been deprived of social visits and legal visits, essentially cutting them off from the outside world.  The pandemic and its necessary lockdowns and quarantines have robbed many of us of important aspects of our lives but for Mr. Asante and his family, they have had to endure these uncertain times with extremely limited contact with those from which they derive their strength and resolve.

Furthermore, due to the pandemic, enrichment activities and opportunities have largely been non-existent for inmates, and very difficult to obtain for inmates fortunate enough to get them. Mr. Asante has been detained at Essex County Correctional Facility and has sought out and participated in the programs available to him.  He has completed: (1) Fractions; (2) Getting a Job; (3) Grammar; (4) Job Success; (5) Money Basics; and (6) Resume Writing.  *See* Certificates and Course Descriptions Annexed Hereto as Exhibit "B".  Additionally, Mr. Asante has completed courses in Contentious Relationships and Employment, physical certificates for which we have not been able to obtain prior to this filing but will be available for the Court's review at sentencing.  Mr. Asante is one of the few inmates the undersigned has represented in the past two years that has been able to participate in any substantial rehabilitative programming despite initially being told that programming wouldn't be available to him.  He had to complete them on his own without the benefit of structured classes.  This fact speaks to Mr. Asante's focus to serve his time productively despite the extremely difficult conditions under which he is detained.

Accordingly, the particularly arduous conditions of Mr. Asante's incarceration during the pandemic and the positive progress he has attempted and made despite the limited resources available to him should be factored into the Court's determination of what constitutes as a just punishment.

**III    Three Years' Imprisonment is Sufficient to Achieve the Goals of Sentencing**

The Guidelines, as applied to Mr. Asante, are overly influenced by the U.S.S.G.'s arbitrary loss table, which neither accurately reflects the severity of the crime committed by Mr. Asante nor constitutes just punishment for his crimes.  These unfair enhancements have already been recognized in the sentencing of Mr. Asante's co-defendant, who received a sentence of less than half of his Guidelines.  Finally, Mr. Asante is a family man that made a mistake, for which he has accepted full responsibility, not someone committed to a life of crime.  For these reasons, 36 months' imprisonment is appropriate.

**(a) The Fraud Guidelines Result in an Advisory Range That is Higher Than Necessary to Achieve Just Punishment and Promote Respect for the Law**

The calculation in the plea agreement, mirrored in the PSR, accurately states the applicable Guidelines range, however it does not reflect the appropriate sentence for Mr. Asante's crimes. Mr. Asante's advisory Guidelines range is largely driven by the loss attributable to him and his criminal history.  The main factors that drive Mr. Asante's Guidelines are: (1) his criminal history category of III as a result of a 16-year-old conviction; and (2) the large amount of offense level points attributable to his crime by virtue of the loss table contained in U.S.SG. §2B1.1.

4

Of his 30 offense level points, more than half (18) of them are attributable to Section 2B1.1's loss table. Although the financial benefit that Mr. Asante received personally was relatively low, his Guidelines are based on the value of the funds he assisted in laundering. This results in an additional 18 offense level points. While this is calculated correctly, it does not accurately reflect the severity of Mr. Asante's offense conduct. The harm to the victims was severe, but it should be noted that Mr. Asante was not personally involved in defrauding victims. The financial gain for Mr. Asante came by way of a foreign exchange conversion rate reduction. While Mr. Asante is deeply remorseful for his actions, they are categorically different than actively defrauding victims. Furthermore, Mr. Asante did not live a life of luxury using victims' money either. He took a shortcut when converting money, something not deserving of a 10-year prison sentence.

As the Second Circuit stated in *United States v. Algahaim*, 842 F.3d 796, 11 (2d Cir. 2016), "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." When the loss Guidelines were created in 1987, Mr. Asante's loss amount would have added 10 points, not 18.[2] This would result in a total offense level of 22 instead of 30. Even at his current criminal history category, his Guidelines would drop from a whopping 121-151 months to a more reasonable Guidelines range of 51-63, but still too severe when considering the totality of Mr. Asante's situation.

In *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), this Court poignantly summarized the problem with the arbitrary nature of Guidelines based on enhancements from the loss table in U.S.S.G. § 2B1.1:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts, and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.

Other cases in this District with Guidelines based on similar or significantly higher loss calculations have also resulted in substantially shorter sentences than Mr. Asante's Guidelines, and even shorter sentences than what the defense is requesting. In *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), where the Court determined that Mr. Adelson's loss amount was between $50 million and $100 million, Mr. Adelson was sentenced to 42 months imprisonment and ordered to pay the full restitution of $50 million. In *Gupta*, where Mr. Gupta was responsible for over $5 million in losses, he was sentenced to 24 months in prison.

Mr. Asante's criminal history category, which is also technically calculated correctly, is reflective of someone that has a history of crime and was not dissuaded from further crime by his previous sentence. That is not true of Mr. Asante. The two convictions that dictate Mr. Asante's Criminal History Category III should be seen as one conviction when determining his sentence. While they were separated by subsequent arrests, the two offenses were sentenced together, ran

---

[2] Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way*, 18.2 OHIO ST. J. OF CRIM. L., 605, 609 (2021).

concurrently, and were a part of the same conspiracy.  Even with his high loss points, if Mr. Asante were in Criminal History Category II, his Guidelines would be reduced by over a year.

Additionally, Mr. Asante was 21 years old in 2006 at the time of his only other conviction, and while his ex-wife was pregnant at the time, he was not yet a father.  The Fred Asante being sentenced for this crime is a completely different human being.  Besides the nature of his 2006 conviction and instant offense being of a completely different nature, the amount of time that has passed between offenses is also remarkable.  While the conspiracy here generally dates back to 2013, Mr. Asante only joined in approximately 2017.  Since his release in 2010 Mr. Asante has pursued technical certifications, started his own business, and most importantly, raised his children and taken care of his mother.  A Guidelines sentence would not act as a greater deterrence than a three-year sentence would, and would be devastating to his family and those closest to Mr. Asante.

Lord Aning, one of Mr. Asante's co-defendants, was recently sentenced by this Court to 24 months' imprisonment.  Like Mr. Asante, Mr. Aning was not personally involved in or had any contact with victims, but was aware that the funds were in fact fraudulent.  Mr. Aning, however, had been at liberty at the time of sentencing.  He was released on bail at his initial appearance.  Meanwhile, Mr. Asante has been incarcerated in unduly harsh conditions during the COVID-19 pandemic.  Additionally, Mr. Aning's advisory Guidelines were lower than Mr. Asante largely due to his lower criminal history category.

Finally, the enhancement for leadership is so broad as to encompass Mr. Asante's actions, when in fact he did not lead any illegal large-scale operation.  The only people that he "managed" were legitimate car salespeople and shipping agents in arm's length transactions.  The size of the enterprise, the fraud of which Mr. Asante was not involved in, dictates that because Mr. Asante was not managed by anyone else, he qualifies as a manager under U.S.S.G. §3B1.1.  In reality, Mr. Asante does not know any of his co-defendants and was not an active participant in defrauding people of their money.  But still, as he accepts, he must have three points added into his Guidelines' calculation.

### (b) A Sentence of More Than Three Years is Not Necessary to Deter Mr. Asante

Although the Guidelines are a starting point when determining a sentence, relying too heavily on them does not factor in who Fred Asante is as a person.  "Human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can lead to bizarre results." *Gupta,* 904 F. Supp. 2d at 350.  Mr. Asante is a father to a sixteen-year-old daughter with his ex-wife, and father to three children with his current wife, the youngest his 2-year-old son and the oldest his 9-year-old daughter.  After serving time for mistakes he made when he was younger and going almost fifteen years without an arrest, Mr. Asante finds himself before the Court to be sentenced for participating in laundering the proceeds of fraud.  His arrest was a shock to those closest to him and brought shame to his family residing here and back home in his native Ghana.  Mr. Asante's history and characteristics favor a downward variance and, considered together with the harsh realities of being detained during the ongoing COVID-19 pandemic, justify our request for a sentence of 36 months' imprisonment.

6

Mr. Asante grew up in a one-bedroom apartment in Ghana with his siblings and parents. To give her children an opportunity for a better life, Mr. Asante's mother immigrated to the United States legally and settled in Virginia. When the Asante family moved here, without Mr. Asante's father who stayed behind in Africa, their living situation improved, but not drastically. They still lived in a small apartment, but Fred understood that he could achieve much more here than he ever could have in his native Ghana.

Despite his father staying back in Africa, the two remained close. Mr. Asante does not blame anyone but himself for his first run in with law enforcement as a young man in 2006. After he was released from custody in 2010, Mr. Asante made a commitment to stay on the straight and narrow path. By all accounts he did so before getting involved in the instant offense. He married his wife and had three children with her. He obtained numerous technical certifications as an HVAC building engineer and was gainfully employed continuously from his release up until his arrest in this case.

While he was only employed full time by his company, Fog Logistics, since 2019, he had been exporting goods part-time since 2012. In that time, he built connections and exported frozen foods and vehicles primarily to Ghana and paid the applicable taxes and duties on everything he shipped. It was due to his reputation as a hard-working supplier that allowed him to expand his business and work at his company full time. It was also this work that got Mr. Asante in trouble to begin with, and for this he takes full responsibility. Before the undersigned was appointed to represent Mr. Asante, we understand that he was already interested in taking full responsibility for his actions, without even having the opportunity to see the discovery in his case. Mr. Asante expressed the same desire to accept responsibility for his actions as soon as the undersigned was appointed, and changed his plea soon thereafter. It is likely that Mr. Asante would have pled guilty far earlier had his relationship with previous counsel been better.[3]

As evidenced by the letters submitted on behalf of Mr. Asante by his family and loved ones, he is someone that anyone would be lucky enough to have as a friend. *See* Letters of Support attached hereto as Exhibit "C". If there is one adjective that ties the letters together it would be

---

[3] The government's use of a letter written by Mr. Asante in their sentencing memorandum is inappropriate. As the government was well aware, relations between Mr. Asante and his then counsel were strained and Mr. Asante was desperate to negotiate a resolution to the matter despite his counsel's posturing that he would proceed to trial. He wanted his counsel to set up a meeting with the government in which Mr. Asante wanted his counsel to advocate for him and negotiate a favorable plea. The government was aware of this. In his frustration, he sent a letter directly to the government. Mr. Asante's letter is tantamount to counsel attempting to bargain with the government and should not be used against him.

Furthermore, it appears that the government is somehow arguing that Mr. Asante should be punished more severely because prior to accepting responsibility publicly before this Court, he wanted the government, when considering the plea offer to make to him, to see him as a human being who made mistakes and not just a prior felon with lengthy advisory Guidelines largely based on the loss amount. As the Court is well aware, it takes each individual her or his own time, but when they accept responsibility for their conduct, they should be rewarded. Perhaps the government's true point should be that, prior to this Court relieving Mr. Asante's prior counsel and appointing the undersigned, Mr. Asante had not had a meaningful and in-depth discussion with counsel regarding the evidence in the case. In fact, shortly after our appointment, the government acknowledged as much and assisted us to understand and marshal the evidence that had been produced in order to have meaningful discussions with Mr. Asante. After fulsome discussions with his new counsel, Mr. Asante agreed to accept responsibility completely for his actions and pled guilty.

"selflessness." He has shown himself to be someone that always puts others first. Whether that be staying with a friend's wife in the hospital while she was giving birth and her husband was out of town or simply giving people in his church community a ride when the weather was bad. *See* letter from Charles Otto; letter from John Sekyere at Exhibit C. These letters were all written by people that really know him and have known him for significant time. Those closest to him in his community know that he is not someone that will reoffend once released. Mr. Asante put others first, and his presence is clearly missed back home.

This situation has deeply affected Mr. Asante's family hardest of all. *See* Asante Family Photos attached hereto as Exhibit "D". His daughter was attending school remotely when the FBI raided their house, and her whole class witnessed agents raiding their home. His wife has had to work multiple additional jobs to support their family and keep food on the table. The rest of Fred's siblings have had to start supporting their mother economically, because up until his arrest, this was his responsibility as the oldest child.

The letters provided by Mr. Asante's family are especially poignant. Both of his daughters with his current wife submitted their own handwritten letters to the court pleading for leniency for their father. *See* letter from A. A.; letter from N. A. at Exhibit C. They have written the Court because they miss their dad. But they are also in their formative years and need their dad home to help raise them. In her letter to the Court, Fred's wife recounts the harrowing morning of her husband's arrest and the impact that it has had on her children. *See* letter from Felina Asante at Exhibit C. Despite the stigma associated with Mr. Asante's charges, the love and support that he has received from his family has never faltered. Mr. Asante's younger brother still looks up to him as a father figure and hopes to one day be able to replicate the love that Mr. Asante has for his wife and children with a family of his own. *See* letter from Akwasi Asante at Exhibit C. Mr. Asante's family is in daily contact with him, and they usually speak to him on the phone multiple times a day. That notwithstanding, due to the extra work that his wife has had to take on and the fact that they live in Virginia, sentencing will be the first time that he has been able to see his children or wife in person since his arrest.

Furthermore, when Mr. Asante's mother heard the news that he was arrested in a scheme relating to fraud she collapsed. His family is all supportive, assisting Fred's defense counsel on a daily basis, but the stigma that comes with being associated with a fraud is especially disgraceful in his community. The shame that he has brought his family is deterrence enough to prevent any further violations of the law. *See* Asante Letter to the Court attached hereto as Exhibit "E" at 2.

Accordingly, Mr. Asante's history and characteristics favor a substantial variance.

## IV.    Conclusion

For all the foregoing reasons, it is respectfully requested that the Court sentence Mr. Asante to 36 months' imprisonment.


Respectfully submitted,

/s/

César de Castro
Valerie A. Gotlib
Shannon McManus


cc:    Sagar Ravi
       Mitzi Steiner
       Assistant United States Attorneys (*via* ECF)

9